**TEMPLE EASTEX, INC., et al, Appellants,**

v.

**SPURGER INDEPENDENT SCHOOL DISTRICT, Appellee.**

**No. 09 85 098 CV.**

Court of Appeals of Texas, Beaumont.

Oct. 2, 1986.

James R. Cornelius, Lufkin, Joe G. Roady, Houston, for appellants.

James A. Clark, Woodville, for appellee.

## OPINION

BURGESS, Justice.

Appellants brought suit for declaratory judgment to have the trial court construe *TEX.TAX CODE ANN. sec. 23.78* (Vernon 1982). They own land in the Spurger Inde-

pendent School District (the School District) which was appraised by the chief appraiser of the Tyler County Appraisal District according to its timber use value for the tax years 1982–84 as required by the Texas Property Tax Code (the Code). The chief appraiser certified both the market value and the timber use value of each tract to the tax assessor of the School District for each of those years.

The chief appraiser assigned a "timber use value" by "category of the land" according to the soil type, soil capability, general topography, weather, location and other factors. Some of the tracts in question contained more than one category of timber growing land. Some categories of land were appraised to be more valuable per acre for the production of timber than others. For example, pine producing land was valued higher than land producing hardwood.

The state legislature instituted the category of land approach to assessing land based on its timber use value as part of the Code which became effective in 1982. Rather than taxing timberlands at 100% of their market value as mandated in the Code for all non-agricultural lands, it opted for an income valuation scheme provided the assessed value under that approach did not fall below the land's 1978 market value. If the value did fall below the 1978 assessment, the legislature provided for a substitution of the timber use value by the 1978 market value. *Section 23.78* of the Code was the mechanism for establishing this floor value. It provides:

Minimum Taxable Value of Timber Land

The taxable value of qualified timber land appraised as provided by this subchapter may not be less than the appraised value of that land for the taxing unit in the 1978 tax year, except that the taxable value used for any tax year may not exceed the market value of the land as determined by other generally accepted appraisal methods. If the appraised value of timber land determined as provided by this subchapter is less than a taxing units appraised value of that land

in 1978, the assessor for the unit shall substitute the 1978 appraised value for that land on the unit's appraisal roll.

Appellants' lands were previously rendered by parcels to the tax assessor of the School District in 1978. Dividing the total number of acres in each parcel into the total value at which the land was rendered in 1978 yields an average per acre value of one hundred twenty dollars ($120.00). For the hardwood producing areas in those parcels, the average price per acre, under the timber use value figures for the tax years 1982–84, falls below $120.00 per acre.

In determining the value upon which qualified timber use lands were to be taxes for 1982–84, the tax assessor substituted $120.00 per acre as the value of any acreage within a parcel of land whose timber use value fell below this 1978 figure. The evidence at trial showed, for instance, that one appellant owned a 1,448.2 acre tract with a 1978 tax roll value of $173,780.00. Under the 1984 timber use valuation, that same parcel appreciated in value to $298,470.00. After the tax assessor's substitution, its value further appreciated to $330,840.00, an additional increase of $32,370.00. This practice was followed by the tax assessor on all of the parcels the subject of this suit.

■ Appellants' first point of error asserts the trial court incorrectly held that the reference in *section 23.78* of the Code to "that land" meant any portion of a parcel of qualified timberland. The appellee argues that this reference permits substitution of the 1978 average appraised value per acre of $120.00 for any acreage within a category of land which was appraised at a lower timber use value. To the extent that the same or substantially the same parcel on the 1978 tax rolls is reappraised for its timber use value, we hold that the reference in *section 23.78* to "that land" refers to the entire parcel rather than a portion of the parcel. Point of error number one is sustained.

■ Appellants' second point of error is also well taken. We hold the trial court

erred in construing *section 23.78* to require the tax assessor to substitute the 1978 average per acre appraised value for any part of a parcel of qualified timberland that has a lower timber use value under the category of land method of appraisement. The legislature did not intend such a substitution when the same or substantially the same parcel is reappraised for its timber use value. In such a case, a parcel's floor value under *section 23.78* of the Code must be determined by reference to its total parcel value on the 1978 tax rolls.

The evidence introduced at trial established that the legislature intended *section 23.78* to establish a minimum taxable value below which the taxable value of timberland, qualified for valuation according to its usefulness in producing timber, would not be allowed to fall. The evidence also showed that legislators were concerned that some taxing units might suffer a serious decrease in their tax bases in the absence of such floor values.

The evidence also revealed that the method by which the School District's assessor determined when a substitution was called for and what value was to be substituted on the appraisal role often resulted in an appraised value for the current tax year which actually exceeded the appraised value of the same land in 1978. As shown, under the assessor's method, the application of *section 23.78* results in an increase in the appraised value of some qualified timberland as compared to its appraised value in 1978. The School District's base was actually increased due to its application of the "floor" in *section 23.78*. The legislature did not intend this result.

The Code itself is further evidence that the legislature did not intend that an assessor use such a method in applying *section 23.78*. Under the Code, the chief appraiser is to appraise qualified timberland according to the "category of the land" using accepted income capitalization methods. *TEX.TAX CODE ANN. sec. 23.73(a)* (Vernon 1982). The chief appraiser is also directed to determine the market value of such land and record both the market value and the appraised value in the appraisal records. *TEX.TAX CODE ANN. sec. 23.73(c)* (Vernon 1982). Then, after the appraisal records are approved by the Appraisal Review Board, the chief appraiser must certify to the tax assessor for each taxing unit in the district that part of the appraisal roll that lists property taxable by the unit. *TEX.TAX CODE ANN. sec. 26.01(a)* (Vernon Supp.1986).

There is no direction in the Code that the chief appraiser send any records regarding the number of acres within a parcel of timberland which is found to be within a particular "category of the land" to an assessor. Similarly, the Code does not direct the appraiser to certify the value placed on any such category of land to the assessor. If the legislature had intended *section 23.78* to authorize the practices here in question, the assessor would have to receive such information to determine when a substitution is called for.

Therefore, the legislature intended that when the same or substantially the same parcel, as was appraised in 1978, has been appraised for its timber use, *section 23.78* allows the assessor to substitute its 1978 appraised value if its total timber use value is less than its total appraised value in 1978. Where a particular tract of land is not the same during a tax year as a tract for which there is a 1978 appraised value on the tax records, a somewhat different problem arises. It presents itself in this case because it is not clear that the parcels reassessed in the tax years 1982–84 are identical to the parcels on the School District's 1978 tax rolls.

Appellants' third point of error contends:

The trial court erred in holding that ad valorem taxes of the respective appellants for the tax years 1982 and 1983 have not been paid in full and that the taxes for 1984 as billed by appellee Spurger ISD to the respective appellants should be paid as billed.

In response to questions from this court during oral argument, appellees stated that all of the parcels of qualified timberland involved in this case were, in effect, the

same parcels for which the School District tax records show an appraised value for the 1978 tax year. However, appellant stipulated in writing in the trial court as follows:

9. The parcels listed on the tax rolls of Spurger Independent School District in 1978 for each plaintiff are also listed for each plaintiff on the 1982, 1983 and 1984 tax rolls of Spurger Independent School District, with only the following exceptions:

(1) the acreage change (sic) because of resurvey;

(2) the acreage changed because part of the land was conveyed away; or

(3) the tract was not owned by that plaintiff in one or more of such years.

■ This stipulation indicated that for some of the tracts involved there may be no appraised value reflected on the 1978 tax records. If the parcels are substantially the same, there would be no error in using their substantial equivalence to compare the total parcel values for the tax years 1982–84 with the parcel values on the District's 1978 tax rolls for the purpose of substitution under *section 23.78*. If the parcels are not substantially the same, however, the assessment must not be based on the acreage averaging method the assessor used to establish the 1978 $120.00 per acre floor value. The state constitution mandates more exacting proof of the 1978 market value in such cases.

*TEX. CONST. art. VIII, sec. 1*, provides, in part:

All real property ... shall be taxed in proportion to its value, which shall be ascertained as may be provided by law.

The term "value" as used in *article VIII, section 1* of the constitution means the reasonable cash market value. *See, Lively v. Missouri K. & T. Ry. Co. of Texas*, 102 Tex. 545, 120 S.W. 852 (1909); *Atlantic Richfield Co. v. Warren Independent School District*, 453 S.W.2d 190 (Tex.Civ. App.—Beaumont 1970, writ ref'd n.r.e.); *Parker County v. Spindletop Oil and Gas Co.*, 612 S.W.2d 944 (Tex.Civ.App.—Fort

Worth 1981), *rev'd on other grounds,* 628 S.W.2d 765 (Tex.1982).

■ If a tract of land is not substantially the same as that for which a taxing entity's 1978 records show an appraised value, it would be unconstitutional to arbitrarily substitute the 1978 value of what was, at least in part, not the same land as the tract upon which the taxes are being assessed in the current tax year. This is especially the case when proof of the 1978 market value can be developed at trial for any portion of a parcel whose timber use value was determined for 1982–84. The requirement of such proof precludes an appraisal method such as the one used in this case that resulted in the total value for an entire tract exceeding the total value at which it was appraised in 1978. It facilitates the substitution envisioned by *section 23.78* by furnishing an accurate 1978 market value for a particular piece of land for comparison with its timber use value. The third point of error is sustained.

The cause is reversed and remanded to the trial court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

BROOKSHIRE, Justice, concurring.

Appellants, Temple-Eastex, Incorporated; Kirby Forest Industries, Inc.; Champion International Corporation and International Paper Company, brought suit for declaratory judgment to have the trial court construe *TEX.TAX CODE ANN. sec. 23.78* (Vernon 1982). They own land in the Spurger Independent School District [I.S.D.], Appellee, which was appraised by the Chief Appraiser of the Tyler County Appraisal District according to its timber-use value for the tax years 1982, 1983 and 1984, as required by the Property Tax Code, being the Short Title, *Sec. 1.01*. The Chief Appraiser certified both the market value and the timber-use value of each tract to the tax assessor of the School District for each of those years.

The Chief Appraiser assigned a "timber-use value" by "category of the land" method according to the soil type, soil capability,

general topography, weather, location and other factors. Some of the tracts in question contained more than one category of timber growing land. Several categories of land were appraised to be more valuable per acre for the production of timber than others, pine producing land being valued higher than hardwood producing land. It is significant that the Appellants' timber lands were valued and appraised at $120.00 an acre in 1978; this fact has crucial statutory relevance.

### Testimony of Tony Bennett

Bennett, a Tax Representative of Temple-Eastex, Incorporated [Temple], had been employed by Temple for 5½ years. He started as an Assistant District Forester, later joining the Tax Department. He had a Master's Degree in Forest Management from Stephen F. Austin University. He had familiarized himself with the tax work of his employer since becoming Tax Representative, beginning with the 1978 tax roll at I.S.D. for '92, '83 and '84.

Temple renders its timber lands by abstracts or surveys in each county, furnishing a list of the properties, with the number of acres of each whole parcel, to the Chief Appraiser.

In 1978, timber-use value was not used. In 1978, a particular parcel of real property was assessed at market value. Applying the tax rate resulted in the tax owed.

After passage of the new act, which allowed owners of timber lands to employ the appraised timber-use value, Temple's parcels all qualified for timber-use value. The Chief Appraiser certified the value of each whole parcel, both as to market value and timber-use value, which were certified to the I.S.D.

Plaintiffs' Exhibit No. 2 [Temple's] was in evidence. Exhibit No. 2 was concerned with Abstract No. 11, the G.J.W. Collins Survey in Tyler County. Temple owns 1,448.20 acres therein. On Exhibit No. 2 there were various contour lines showing the demarcation lines between the soil classes and various types of timber. Categories were designated as H–1, M–1, P–1, and P–2. The new code provides that lands on timber-use basis shall be appraised in these categories. "H" stands for hardwood, "P" stands for pine, and "M" stands for mixed—both pine and hardwood. The numbers represent soil classes. Soil classes are good soil, or bad soil, or medium. One is the best soil; two is next to best. P–1 then means the best pine growing land.

On the G.J.W. Collins Survey in Tyler County, of 1,448.20 acres, Plaintiffs' Exhibit 2 reads:

| "Timber Category | | Acres | Timber-Use Value Per Acre | Total Timber Category Value |
|---|---|---|---|---|
| "Hardwood 1 | (H1) | 356.71 | $ 81 | $ 28,890 |
| "Hardwood 2 | (H2) | 302.62 | 59 | 17,860 |
| "Mixed 1 | (M1) | 20.78 | 278 | 5,780 |
| "Mixed 2 | (M2) | 69.75 | 202 | 14,090 |
| "Pine 2 | (P2) | 698.34 | 332 | 231,850 |

"Total Parcel                              Total Timber-Use

          "Acres: 1,448.20                      Value: $298,470

"Appraisal Done by Foster & Ross, Consulting Foresters under contract for Tyler County Appraisal District."

Plaintiffs' Exhibit No. 3 shows:

"1984 Parcel Breakdown Showing

| "Timber Category | Acres | Spurger I.S.D. "Timber-Use "Value Per Acre | | Substitutions Total Timber Category Value | |
|---|---|---|---|---|---|
| "Hardwood 1 (H1) | 356.71 | | | | |
| "Hardwood 2 (H2) | 302.62 | $ 81 | $120 | $ 28,890 | $42,805 |
| "Mixed 1 (M1) | 20.78 | 59 | $120 | 17,860 | $36,314 |
| "Mixed 2 (M2) | 69.75 | 278 | | 5,780 | |
| "Pine 2 (P2) | 698.34 | 202 | | 14,090 | |
| "Total Parcel | | 332 | | 231,850 | |
| Acres: | 1,448.20 | Total Timber-use | | | |
| | | Value: | | $298,470 | $330,840 |

"$173,780/1448.20 acres = $120 AVERAGE PER AC."

---

Temple followed the Foster & Ross's categories and values. These were certified by the Chief Appraiser, who had employed Foster & Ross, expert timber appraisers.

On the 1978 Tax Roll, the total value of this 1,448.20 acre tract was $173,780.00. In 1978, if a taxpayer went to the tax office he would find that the assessed value was 65% of the $173,000.00 for this tract. In 1978, there was no concept of timber-use value. The timber-use basis is higher in '84 than was the market value basis in '78, approximately 72% higher.

*Ms. Jordan, the Assessor's Approach*

The Assessor's approach *was shown* on Plaintiffs' Exhibit No. 3. She raised the timber-use value per acre from $81 to $120 on the Hardwood 1 (H1) 356.71 acres and raised the timber-use value per acre from $59 to $120 on the Hardwood 2 (H2) 302.62 acres. She accepted the other appraisals on Mixed 1 (M1), Mixed 2 (M2), and Pine (P2), since each was above $120 an acre. This raised the total timber category value from $28,890 in the Hardwood 1 (H1) category to $42,805, and raised the Hardwood 2 (H2) category from $17,860 to $36,314 total timber category value. The other categories were not changed because under her theory each was above $120 average value per acre. When the total timber-use value per whole parcel was less than the 1978 values, there was no objection by Appellants to her raising it to the '78 value. She made no substitution where the "categories of the land" in a whole parcel were each above $120 an acre.

On cross-examination, Bennett said that all of Temple's timber lands were rendered in parcels with I.S.D. There were no parcels that were divided.

Bennett testified that all of his parcels (unless it was a resurvey or something was sold off or a parcel recently acquired) on the '84, '83, and the '82 rolls *were the same as they were on the '78 roll.*

*The Testimony of Horace Moye*

Moye was employed by Kirby Forest Industries as Manager of Tax and Land for approximately 6½ years. Kirby has some parcels that are similar to Temple's in the I.S.D. Kirby's exhibit was P–4 in evidence. Kirby's rendering was by whole parcels as to survey and abstract, showing total acres by parcels. If Kirby had three separate parcels in one survey, each was rendered separately provided each was bought at a different time.

The 1978 records do not reflect any "category of the land" determination.

Plaintiffs' Exhibit No. 4, in pertinent part, reads:

| "ACRES | 1982 TIMBER VALUE | 1978 APPRAISED VALUE | (1) 1982 TAXABLE VALUE | (2) 1982 TAXABLE VALUE |
|---|---|---|---|---|
| " 49.85 | 9,000 | 6,314 | 9,000 | 9,684 |
| 142.29 | 37,920 | 17,985 | 37,920 | 38,875 |
| 202.47 | 49,010 | 25,714 | 49,010 | 50,860 |
| 320.08 | 90,340 | 40,545 | 90,340 | 93,590 |
| 652.30 | 169,770 | 78,276 | 169,770 | 174,765 |
| 666.62 | 179,740 | 76,800 | 179,740 | 180,414 |
| 159.88 | 57,960 | 20,252 | 57,960 | 59,169 |
| 74.11 | 27,220 | 9,412 | 27,220 | 27,595 |
| 100.00 | 18,300 | 12,333 | 18,300 | 19,102 |
| 559.52 | 101,160 | 70,874 | 101,160 | 106,221 |
| 688.82 | 160,980 | 87,253 | 160,980 | 169,412 |

"(1) Taxable Value Per Kirby

"(2) Taxable Value Per Collector

"The above are the only tracts where value was changed."

---

### Witness Victor Oldenbuttel

Oldenbuttel was the Property Tax Representative for Champion International. He held a Bachelor of Science degree in Forestry. He testified that some parcels had timber-use valuation in '82, '83, and '84 higher than the '78 tax roll. There were some whole parcels appraised by "categories of the land" method containing hardwood that fell (as a parcel) below the $120.00 an acre value. Ms. Jordan, the Tax Assessor, upped those figures on the hardwood acres to $120.00 for each acre.

### Witness Stan Lindsey

Lindsey stated International's '78 tax records and their records for '84, '83, and '82, revealed that the same parcels were listed in the I.S.D. 1978 rolls, the parcels being unchanged. In twelve parcels out of twenty-two of International's, Ms. Jordan, the Tax Assessor, made substitutions to certain parcels. There were some instances where Ms. Jordan raised the value of his company's land in 1982, 1983, and 1984 above that in 1978. These were several small tracts raised to $7,670.00. The Appraisal District had these valued at $5,520.00. We decide these evaluations should be fixed at $6,000.00, being $120.00 an acre on these fifty acre parcels. The timber-use appraisal was $5,520.00, justifying the $6,000.00 value pursuant to *TEX.TAX CODE ANN. Sec. 23.78* (Vernon 1982). He agreed Ms. Jordan had the right to increase the value to $6,000.00. We agree, also, in the case where the timber-use value for a *whole parcel* is less than the total value of the whole parcel figured at $120.00 an acre.

### Marjorie Jordan, Tax Assessor

Marjorie Jordan was called under the adverse party rule. She had been the Tax Assessor and Collector for about fifteen years. She was in office in 1978 and before.

In 1978 she maintained the tax roll and in 1978 the tax roll showed the abstract number, the title of the abstract, the number of acres, the taxable value, and the amount of taxes. She agreed that agricultural property was to be taxed on a productivity basis and certainly timber property was to be taxed on a productivity basis, and that the function of determining timber productivity belonged to the Chief Appraiser. The Chief Appraiser employed foresters Foster and Ross, timber experts. These experts were to categorize the land and place the value by categories. The first time that the categorization of the land and of value by categories were used occurred in 1982.

The Chief Appraiser's office sent to Ms. Jordan a certified roll of timber-use values by the different categories. For example, she was asked about the 1,448.20 acre tract:

"Q What did that roll show about that tract?"

She replied:

"A It showed—as it does there on the left—hardwood one, a number of acres; hardwood two, a number of acres; and a value by each one of those acres."

Then:

"Q Right on through to P–2?

"A Yes, sir.

"Q Then did it have a total?

"A Yes, it had a total.

"Q ... the total timber use value ... was two hundred ninety-eight thousand four hundred seventy dollars [$298,470.]?

"A Yes, sir.

"Q [And on the] 1978 roll for that same tract of land ... it was [set at] a hundred seventy-three thousand seven eighty [$173,780.]?

"A Yes.

"Q [And] It would probably be sixty-five percent of that....

"A Yes.

"Q So what you had on that tract of land, is that the timber two hundred ninety-eight thousand dollars certified to you and that was higher than the 78 value, which was only a hundred seventy-three thousand. And yet you raised it even more?

"A Yes, sir."

She said that, under *Section 23.78, any portion or category of a parcel* that falls below $120.00 per acre shall be increased by the Tax Assessor to the 1978 value of $120.00 per acre. She continued:

"Q It says if that land was higher in 1978 than the timber use value, you should raise it to that?

"A It said if that land was lower than my 1978 value, that I should raise it to the 1978 value.

"Q If that land comes out on this timber use lower than it was in 78, you should raise it?

"A Which it does in hardwood.

"Q *You're looking on that statute as talking about every particular acre of it apparently?*

"A *Yes, sir.*

"Q *And not about the tract itself?*

"A *No, sir. It was rendered to me by acres.*

(Emphasis added)

### The Legislative History and Legislative Intent

Fortunately, we have the benefit of some of the crucial proceedings before the House and the Senate in the passage of the Property Tax Code. These proceedings came into the record without objection.

In the House of Representatives, the information was brought forward by the designated custodian of the Committee on House Administration for electronic recordings, wherein that custodian, Laura Pickett Calfee, certified to the tape recordings concerning H.B. 1535 on May 5 and 6, 1975, Floor Proceedings; as well as H.B. 22, February 15, 1977, and February 16, 1977, Floor Proceedings; H.B. 1060, March 13, 14, 15, and 19, 1979, Floor Proceedings; and H.B. 22, January 31, 1977. The proceedings were certified to be true and correct. Other certificates were attached by the Secretary of the Texas Senate.

### Representative Sullivant

Representative Sullivant spoke to the effect that there had been some sentiment to take forest land out of the bill. He suggested an amendment agreeable to the original author which would place a floor, proclaiming, "it says that the ad valorem tax evaluation of forest land shall never be lower than the assessed value of the land for the 1976 tax year." Representative Sullivant spoke again two years later, saying that the floor would be moved up to the 1977 tax year "so those of you in East Texas who were afraid that your school districts and so forth would be bankrupt

because of this provision, you will notice that the tax, or at least the evaluation, cannot go below what it is evaluated at this year."

### The Senate Debate Between Sen. Jones and Sen. Doggett

There was a debate in the Texas Senate on May 8, 1979:

"DOGGETT: What about the timber barons, how are they going to fare under this?

"JONES: Senator, again the provision is that timber land would be subject to appraisal, based on its productivity.

"DOGGETT: It is going to be a pretty substantial savings for them isn't it?

"JONES: No sir, it would not have any decrease because we provide that on the appraisal their taxes will not be less than they are for the tax year 1978.

"DOGGETT: So there would be no reduction from current levels for timber barons.

"JONES: That is correct.

"DOGGETT: What about a ...

"JONES: Now Senator, I would like to say one thing here. You referred to timber barons, I would also like to point out that most of the land that would be subject to the appraisal is not owned by corporations. Most of it is owned privately, out of corporate form.

There was more spirited, heated debate. It would not be profitable to unduly lengthen this opinion. Suffice it to say, that it appears on an usually clear record that the legislative intent was to place a "floor" on timber land valuations—using as its basic criterion the productivity of timber lands. The following statute resulted.

*TEX. TAX CODE ANN. sec. 23.78* (Vernon 1982) provides:

"Minimum Taxable Value of
Timber Land

"The taxable value of qualified timber land appraised as provided by this subchapter may not be less than the appraised value of that land for the taxing unit in the 1978 tax year, except that the taxable value used for any tax year may not exceed the market value of the land as determined by other generally accepted appraisal methods. If the appraised value of timber land determined as provided by this subchapter is less than a taxing unit's appraised value of that land in 1978, the assessor for the unit shall substitute the 1978 appraised value for that land on the unit's appraisal roll."

We conclude that *TEX. TAX CODE ANN. sec. 23.78* (Vernon 1982) was manifestly intended by the legislature to place a floor under its timber-use value if the land qualified as timber productive land. We decide this timber-use value applies to the tax years of '82, '83, and '84 in issue, and that the floor was the valuations on the rolls of the school district for 1978, applied by the whole parcel.

The fair market value approach was abandoned if the land could qualify as timber-use land. It is also clear that the timber productivity evaluation of a whole parcel could not fall below the value on the 1978 roll when figured by that whole parcel. The Tax Assessor correctly used the Mixed 1, Mixed 2, and Pine 2, which were above $120.00 per acre, to the timber productivity value on "Exhibit 2". The assessor, we conclude, could not raise Hardwood 1, at $81.00 an acre, to $120.00; nor Hardwood 2, at $59.00 an acre, to $120.00, under our construction of *Sec. 23.78*.

Under the 1984 timber-use valuation or timber productivity valuation, the 1,448.20 acres were appraised at $298,470.00. But, after the Tax Assessor made her substitutions for Hardwood 1 and 2, its value increased to $330,840.00, which was an additional increase of $32,370.00. This same method of substitution was applied by the Tax Assessor to all of the parcels. The trial court agreed with the Assessor's substitutions. Hence, we hold the trial court erred in holding that *Section 23.78* of the *Property Tax Code*, which refers to "that land", means any acre or acres or portion of a whole parcel of qualified timber land. We decide that the phrase "that land" in *Section 23.78* refers to the whole parcel of

land rather than a part of the parcel. Point of Error No. One is sustained.

Point of Error No. 2 argues that the trial court erred in holding that *Section 23.78* of the *Property Tax Code* requires, that when any acre or portion of a whole parcel of qualified timber land has a value appraised by the "category of the land" method, which was less than the average per acre appraised value of the land on the 1978 rolls (which was $120.00 per acre), that the Tax Assessor substitute the 1978 average value per acre of $120.00 for that acre or portion. We confidently sustain Point of Error No. Two. We hold that the values under the "category of the land" method, that are less than $120.00 per acre, cannot be raised to $120.00 where the timber-use value of the whole parcel is higher than the value of that parcel on the 1978 rolls. We so hold whether the $120.00 an acre was an average or not. We direct that the parties look to the "appraised value ... in the 1978 tax year...." We conclude a parcel's floor value under *Sec. 23.78* must be determined by referring to the total value of the whole parcel on the 1978 tax rolls.

We hold that when the same, or substantially the same parcel, having an appraised value on the 1978 tax rolls has been reappraised for its timber productivity value, then *Section 23.78* empowers the Assessor to substitute the 1978 value if—*but only if*—the whole parcel's total timber-use value is less than its total appraised value on the 1978 rolls.

The last and third point contends that the trial court erred in holding that the ad valorem taxes for the Appellants for the years 1982 and 1983, respectively, *have not been paid in full* and that the taxes for 1984, as billed by the Spurger Independent School District to the respective Appellants, should be paid as billed. Following our construction of *Section 23.78*, we sustain Point of Error No. Three.

We sanguinely hold that the trial court erred in construing *Section 23.78* as either requiring or permitting the Tax Assessor to substitute 1978 appraised value at the rate of $120.00 an acre for any acre or portion of a whole parcel of qualified timber land that *had a lower timber-use value than $120.00 an acre* because the legislature, under *Section 23.78*, intended to establish a minimum taxable value for a whole parcel, being the "appraised value ... in the 1978 tax year...." The legislators were troubled that some taxing entities might suffer a serious decrease in their total tax base in the absence of such minimum of floor values.

Appellee took the position at oral submission that all of the parcels of qualified timber land involved in this case were, for practical purposes, the same identifiable parcels for which the School District's tax records show an appraised value for the 1978 tax year. This seems generally correct; however, there is a stipulation in the record as follows:

"9. The parcels listed on the tax rolls of Spurger Independent School District in 1978 for each plaintiff are also listed for each plaintiff on the 1982, 1983 and 1984 tax rolls of Spurger Independent School District, with only the following exceptions:

"(1) the acreage change because of a re-survey;"

[This should not cause any problems because the nature of the land would not have changed and is still identifiable as the same parcel.]

"(2) the acreage changed because part of the land was conveyed away; or"

[Frankly, this ought not to cause any problems unless there was also a change of the use of the land that was conveyed away. We think that that has not been shown in this record.]

"(3) The tract was not owned by that plaintiff in one or more of such years."

Even with these minor changes, if the whole parcels involved were substantially the same in 1982, '83, and '84 as they were in 1978, there would be no error in using their whole parcel timber productivity value as compared to the same whole parcel values in 1978, when applying the "category of the land" method.

The Code Construction Act, formerly *TEX.REV.CIV.STAT.ANN. art. 5429b–2* (Vernon Supp.1985), now known as *TEX. GOV'T CODE ANN. Chapter 311;* and, specifically, *Sec. 311.021(3)* thereof, (Vernon Pamph.1986), directs that words are to be read so that a just and reasonable result will ensue. Our construction of *Section 23.78* insures a floor of values for taxing entities, such as Spurger I.S.D.; and, indeed, inevitably increases the total, district-wide evaluations. As to timber lands, uniformity will result throughout the timber growing counties of Texas—certainly a desirable aim.

The judgment is reversed and the cause remanded for proceedings consistent with this opinion. The language herein has been authorized by my colleagues.

REVERSED AND REMANDED.